**UNITED STATES of America,**

v.

**Vittorio Giuseppe CUCCI also known as "Victor" and Janet Marie Cucci.**

Crim. A. No. 94–82–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

May 18, 1995.

---

John Saul Edwards, Roanoke, VA, Robert B. Allen, Charleston, WV, W. Mark Burnette, King, Allen & Arnold, Charleston, WV, and Thomas Joel Hall, Thomas Alan Leggette, and Neil Vincent Birkhoff, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for defendants.

Hunter Smith, Asst. U.S. Atty., and Donald Stennett, U.S. Attorney's Office, Charleston, WV, for the U.S.

## MEMORANDUM OPINION

TURK, District Judge.

On June 16, 1994, a Roanoke federal grand jury returned an eleven count indictment charging the Defendants, Victor and Janet Cucci, with various criminal conduct. These charges included: four counts of income tax evasion, 26 U.S.C. § 7201; four counts of aiding and assisting in the filing of false income tax returns, 26 U.S.C. § 7206(2); two counts of structuring financial transactions to evade currency reporting requirements, 31 U.S.C. §§ 5322(a), 5324(3) and 31 C.F.R. § 103 (1994); and one count of conspiracy relating to the structuring charges, 18 U.S.C. § 371.

The matter is presently before the court on the Defendants' pre-trial motions to suppress evidence. FED.R.CRIM.P. 12(b)(3) and 41(f). The Defendants contend that: (1) the warrantless arrest of Victor Cucci on the evening of July 25, 1991 was presumptively unreasonable and in violation of the Fourth Amendment; (2) the subsequent searches of Cucci's residence, cars, cabin, and restaurant were invalid because they were based on consent that was both coerced and tainted by the Fourth Amendment violation; and (3) the searches that were conducted were beyond the scope of any consent that may have been given. The Defendants ask the court to suppress all evidence seized by the police on the night of Cucci's arrest and the morning thereafter.

The government has filed a brief in opposition, arguing that the warrantless arrest was justified based upon exigent circumstances present at the time it was conducted. In the alternative, even if exigency did not exist and the arrest was unlawful, the government believes that the evidence is still admissible because Cucci voluntarily consented to the searches after he had been removed from his home. Therefore, the government reasons, any Fourth Amendment violation that may have initially occurred was attenuated by intervening circumstances and the evidence

cannot be viewed as an exploitation of illegal police conduct.

An evidentiary hearing was held, on November 29, 30 and December 1, 1994, to create a record from which the merit of the Defendants' motions could be ascertained. During that hearing, exhaustive testimony was proffered by twenty-seven witnesses. Thereafter, on March 16, 1995, arguments on the suppression motions were presented to the court. The matter was taken under advisement and is now ripe for consideration.

Having carefully reviewed the parties' pleadings, the record, all of the evidentiary testimony, and the relevant case law, the court finds that it must grant the Defendants' motions. The government has failed to show by a preponderance of the evidence that the warrantless arrest of Victor Cucci was justified by exigent circumstances. In addition, the court finds that Cucci's consent to the searches was not given voluntarily. Moreover, even if it could be said that exigency existed and Cucci's consent was the product of free and unconstrained choice, the court believes the scope of the searches that were conducted was overly broad.

### Factual Background [1]

Beginning in the late 1980s, the Virginia State Police, in conjunction with the Internal Revenue Service, ("IRS"), and the United States Customs Service, began investigating Victor Cucci's involvement in drug trafficking and money laundering. Early in 1991, after several years of intermittent surveillance, these agencies were contacted by the Charleston, West Virginia office of the Drug Enforcement Administration, ("DEA"). Thereafter, on May 6, 1991, a formal meeting was conducted in Roanoke, Virginia. At the conclusion of that meeting, the DEA decided that a joint undercover operation should be launched.

The operation entailed using an informant, Robert Seidman, to make controlled buys of cocaine from Cucci.[2] The strategy was to have the informant initially buy a single kilogram of cocaine and set up a long term distribution plan. Once Cucci trusted Seidman, a larger order for multiple kilos would be placed. In so doing, the government was confident it could expose Cucci's supplier and force him to come to Covington. During this larger transaction, both Cucci and his supplier would be arrested simultaneously.[3] Along with the drug purchase, the operation also called for a money laundering sting. This would require purchasing automobiles from Cucci's dealership with cash that was represented to be the proceeds from previous drug

---

1. Victor Cucci is a forty-two year old immigrant who came to this country in 1973 and became an American citizen in 1982. He is married to co-defendant Janet Cucci and the couple has two children. Up until these events transcended, the Defendants were living together in a suburban home located in Covington, Virginia. Despite possessing only the barest of formal education and faced with having to learn a second language, Victor Cucci's tenacity and hard work resulted in numerous successes as an entrepreneur. Over time, he became the proprietor of various businesses in the Covington area including two restaurants, a flower shop, a clothing store, a nursing home, and a car dealership. He also owned a substantial financial portfolio that included residential and commercial properties. In addition to his financial acumen, Cucci was known throughout the community as an individual who regularly gave his time and money to charitable organizations. In short, the Defendants were model citizens who had never been in trouble with the law.

Unfortunately, this abruptly changed on July 25, 1991, when Victor Cucci was arrested and charged with drug distribution. At his criminal trial, Cucci did not deny his involvement in the criminal enterprise, but rather raised an entrapment defense. A jury rejected this argument and found Cucci guilty. He was subsequently sentenced to over fourteen years in a federal penitentiary. Presently, he has served three years of that sentence. Importantly, because of the nature of his defense, the validity of his warrantless arrest and the subsequent searches of his property was never challenged during the previous trial.

2. Robert Seidman was a known drug dealer, who resided in Greenbrier, West Virginia. He agreed to cooperate with law enforcement officials pursuant to a plea agreement.

3. Having recorded multiple conversations between Seidman and Cucci, law enforcement officials believed there was a strong possibility that the supplier was an old friend of Cucci's who was now residing in the state of New York, Joseph Covello. In addition, they also had received information about the possible involvement of an accountant located in Pennsylvania named Mark Bonn.

transactions. It would be emphasized to Cucci that the cash should remain anonymous and that it could not be reported to the IRS.

The undercover operation came to fruition on July 25, 1991. Prior to that day, Seidman had negotiated to purchase one kilogram of cocaine and a car from Cucci. The prices of the cocaine and the automobile were set at thirty thousand dollars ($30,000.00) and fifteen thousand dollars ($15,000.00), respectively. The state law enforcement officials involved in the operation agreed to front the "buy money" for these transactions.[4] They also agreed that, if the situation required it, the purchase money would be allowed "to walk."

At 11:00 a.m., Cucci phoned Seidman and informed him that the cocaine had arrived in Covington and that he wanted to make the sale that day. Seidman contacted the government agents and they set up a surveillance team. In addition, a makeshift headquarters was established in an area known as Hart's Run in Greenbrier National Forest, West Virginia.[5] Seidman was wired with electronic transmitter and supplied with approximately forty-five thousand dollars, ($45,000.00). In addition, officers were delegated surveillance assignments by the DEA Resident Agent in Charge, Allen Michael Keaney, ("Keaney").

About 4:00 p.m., Seidman, accompanied by DEA Agent Austin Burke, ("Burke"), arrived at Cucci's car dealership. At the same time, a police surveillance van was driven to a parking lot next to the dealership in order to observe the transaction. Moments later, Cucci met with Seidman and Burke and informed them that he had, not one, but two kilos of cocaine that he wished to sell. This presented a dilemma for the investigators because they had already decided that additional funds could not be raised for the operation. Nevertheless, despite the fact that he did not have a sufficient amount of cash with him, Seidman agreed to buy the second kilo. Cucci, realizing that Seidman was short of funds, left the dealership momentarily and returned with fifteen thousand dollars ($15,000.00) of his own money. He gave the money to Seidman so that the transaction could be completed and Seidman agreed to repay Cucci the following day by 3:00 p.m.

After the financial aspects of transaction had been addressed, Cucci asked Seidman if he would travel to Cucci's cabin to complete the deal.[6] Seidman agreed and, leaving Agent Burke at the dealership, drove in a separate car to the cabin. They arrived at approximately 5:13 p.m. Meanwhile, the police surveillance van followed them and stopped on a side street close enough to continue to monitor the exchange.

When they arrived at the cabin, two things of import occurred. First, Seidman quickly made it known to the police surveillance team that an assault rifle was present. Second, a third individual appeared and was spotted putting the cocaine into the back of Seidman's car. This was the first time that investigators learned that a firearm was present and this information was immediately disseminated to the other officers working on the operation. Furthermore, they began to believe that the unknown third party might be Cucci's supplier, Joseph Covello.[7]

After twenty to thirty minutes at the cabin, Seidman returned to the car dealership and rejoined Agent Burke. The two waited for a short period of time expecting Cucci to return. When Cucci failed to reappear,

---

4. The record indicates that all of the money was supplied by state law enforcement agencies. The Virginia Department of State Police and the Beckley Police Department of West Virginia each contributed ten thousand dollars. ($10,000.00). The rest of the buy money, twenty-five thousand one hundred and eighty-eight dollars, ($25,188.00), was contributed by the Greenbrier County Police Department.

5. Hart's Run is located approximately thirty miles from Covington, Virginia.

6. The cabin is located on Dolly Ann Drive in Covington, Virginia, three miles from the car dealership. It is situated in a secluded area that backs up to a national forest and is directly behind Cucci's restaurant.

7. On the way to the cabin, the police surveillance team passed a Ford Aerostar van that was occupied by two individuals and had Pennsylvania registration. Later in the day, having traced the van's license plates, officers identified the automobile as belonging to Covello.

Burke and Seidman departed the dealership and headed to the operation's pre-arranged headquarters at Hart's Run. About this same time, Virginia Police Special Agent Douglas W. Orebaugh, ("Orebaugh"), who was part of the surveillance team monitoring the cabin, met with Agent in Charge Keaney on a side street behind the Cucci restaurant and informed him about what had transpired. Although pleased with their good fortune, Keaney told Orebaugh that a more positive identification of Covello was needed before a decision to arrest could be made. Pursuant to this conversation, officers were dispatched to the Cucci's restaurant to confirm Covello's identity. This was accomplished at approximately 6:00 p.m., when Orebaugh successfully took photos of Cucci and Covello talking to each other at the back door of the pizzeria.

Between 6:00 and 6:30 p.m., all of the agent's involved in the undercover operation returned to Hart's Run for a debriefing. During their discussions, the presence of the AK–47 in the cabin was confirmed. In addition, they were now convinced that Covello had been the third individual at the cabin. It was also during this period that the two kilos of cocaine were examined. The officers noted that one of the two kilos had been cut open and resealed.[8] This suggested that some of the cocaine might have been "pinched" by one of the parties to the transaction.

After their initial discussions, Agent Burke phoned the Assistant United States Attorney assigned to the case, Hunter P. Smith, Jr. Based on what Burke told him of the day's events, Smith believed that arrests could be made. Smith's approval was then passed on to Keaney, the lead agent in charge. Keaney, believing that the evidence against Covello was the best they could expect, decided that Covello should be located and arrested. If this could be accomplished, Keaney intended to arrest Cucci immediately thereafter.[9] However, if the supplier's whereabouts were unknown or if he had already returned to New York, Keaney would have to refrain from arresting Cucci until a later date.

Based on their previous surveillance, the agents believed that Covello and Cucci were still at the pizzeria. Therefore, before the debriefing at Hart's Run was completed, three officers were sent back to Covington to watch the restaurant. Upon reaching Covington, however, one of the officers spotted Covello's van accessing Interstate 64 and heading east. The three officers, who were now almost out of radio contact with Hart's Run, relayed this information to Agent Orebaugh. Orebaugh and Burke immediately set out for Covington to assist in the arrest of Covello.

While in transit, Orebaugh made several relevant decisions. He determined that Covello should be allowed to leave the city of

---

8. One of the kilos was still in it original packaging with red tape wrapped around its sides. The other kilo was in a plastic bag and was missing its original wrapper. Seidman, who was a known user, was searched but no drugs were found on him.

9. During the evidentiary hearing, DEA Agent Keaney testified as follows:

Court: What is your testimony?
A. [O]nce I became aware of how the transaction transpired, I felt we had [the] best evidence against Mr. Covello. I figured we had accomplished that part of the operation to get the source of supply that was involved in the transaction.
Court: [Did] you intend to do anything with Mr. Cucci that night?
A. Your Honor, my plan was once we arrested Mr. Covello I had no doubt in my mind we were going to arrest Mr. Cucci.... If, in fact, [Covello] got [sic] arrested and we were successful, then I certainly would plan to arrest Mr. Cucci. If Mr. Covello escaped our detec-

tion I would not have arrested Mr. Cucci that evening. *I think one [was] predicated on the other.... [I]f we found them both [at the restaurant], we'd arrest them all there ... I certainly would have arrested Mr. Cucci, also, if we found Mr. Covello with him.* (Tr.Vol. I at 227–30.) (emphasis added).
Q. [What was] the reason that you all went forward with the arrest of Mr. Cucci?
A. ... Mr. Cucci's arrest was predicated solely on Mr. Covello's arrest. Solely. I had plans on Saturday that if, in fact, we did not get Covello we would consider getting thirty thousand dollars ($30,000.00) together to show Mr. Cucci to get some more additional undercover conversation with Mr. Cucci and then probably arrest him. I had no intention of spending thirty thousand (30,000) more dollars. But if we could not arrest Mr. Covello, I can certainly testify under oath here that my intention was not to arrest Mr. Cucci until the following Saturday. (Tr.Vol. I at 239.)

Covington and that the arrest would not take place until they had reached a more rural section of the highway. This was done so that fewer civilians would be near the arrest scene. In addition, the officers were now aware that Cucci was no longer with Covello and they feared that news of Covello's arrest in Covington or nearby Allegheny County would reach Cucci rapidly. Orebaugh radioed ahead and was able to retain the services of state officers from Allegheny and Rockbridge Counties. These officers were in unmarked police cars and they quickly positioned themselves around Covello's van. In total, approximately ten patrol cars assisted in the arrest. However, because numerous police agencies were involved, Orebaugh had to communicate to the officers over a state radio frequency. Importantly, this meant that the officers' conversation was not secure and that it could be monitored on a police scanner.

The officers maintained normal speeds and pursued Covello for more than thirty miles outside of Covington. Eventually, Covello's van reached the Maury River Bridge in Rockbridge County and Agent Orebaugh ordered the arrest to be made.[10] At approximately 9:10 p.m., Covello and an associate who was driving the van, Antonio Musso, were stopped and arrested. In addition, close to forty-five thousand dollars, ($45,-000.00), was confiscated by the officers.[11] Covello and Musso were then transported to the Rockbridge County Regional Jail by a state trooper.

By the time Covello had been apprehended, Keaney and the other officers remaining at Hart's Run had reassembled at the Covington Police Department. News of Covello's arrest was promptly relayed back to that location. However, Keaney testified that he had difficulty talking directly with Covello's arrest team because they were almost totally out of radio range. As a result, Keaney claims that he was not informed about the particulars of Covello's arrest until at least 9:30 p.m.

After Covello's arrest, all of the officers returned to the Covington Police Department.[12] Although the exact time is in dispute, it appears that this occurred sometime between 10:00 and 10:30 p.m. Once at the police department, the money recovered from Covello was examined in a conference room by Keaney and other officers. Serial numbers from the confiscated money were matched against photostatic copies previously made of the buy money. The agents were able to identify certain bills recovered from Covello as marked currency, but they noted that the denominations of other bills were not the same as the front money given to the informant. Further, it was clear that a large portion of the sixty thousand dollars, ($60,-000.00), used to make the actual purchase, was missing. While the officers did not have enough time to discover whether all of the marked currency was present, they now believed that the rest of the proceeds from the drug sale were in Cucci's possession.

By the time the officers had reassembled at the Covington Police Department, the money was examined, and the details of Covello's arrest had been explained, it was around 11:00 p.m. The officers claim that it was at this point that they realized they were going to have to arrest Cucci immediately. The officers felt that time was of the essence for several reasons: word of Covello's arrest was likely to get back to Covington at any moment; a substantial portion of the money used in the transaction was missing; they believed that some of the cocaine had been

---

10. The bridge was considered an appropriate place to make the arrest because it was located on an isolated section of the highway and there was a severe drop which eliminated the possibility of anyone attempting to flee from the scene on foot.

11. The officers found $39,637 dollars in a brown paper bag that Covello had in his lap. An additional $6,500 dollars was found under one of the van's visors.

12. It should be noted that, on their return trip, Agents Orebaugh and Burke stopped for coffee in Lexington, Virginia. Orebaugh testified that, while they were in a hurry to get back to the Covington Police Department, he had been up since 5:00 a.m. that day and had not eaten. He further testified that the stop lasted only minutes and that the coffee was consumed on the ride back to Covington. (Tr. Vol. I at 139.)

"pinched;" and they feared the AK–47 would "follow" Cucci.[13]

Because Cucci's car had been sighted at his residence, the decision was made to arrest him at that location. The point at which the officers knew that Cucci had returned to his home is in dispute,[14] but both sides agree that an arrest team comprised of twenty-five to thirty officers arrived at the residence at approximately 11:30 p.m. Once they had arrived at the Cucci home, a group of five officers approached the front door.[15] The remaining members of the arrest team circled the home to secure other exits.

Upon reaching the front door, one of the officers began to knock loudly. At the same time, the other officers announced themselves as the police, displayed their badges, and stated that they were there to arrest Victor Cucci. Despite these efforts, for a brief period of time, there was no response from inside the home.[16] Further, one of the officers began to see adults congregating in the foyer. Eventually, Agent Burke moved to the forefront of the group and kicked the door, damaging the lock and leaving a footprint. The door was then immediately opened by Victor Cucci. The officers rushed into the home with their weapons drawn and told the individuals to "drop to the floor." Although it is not clear from the testimony, it appears that three people were present in the foyer when the officers entered: Victor Cucci; Janet Cucci; and the Cucci's accountant, Mark Bonn. Officer Burke quickly located Victor Cucci, who by now had voluntarily lowered himself to the ground, and placed him under arrest. Meanwhile, Mrs. Cucci, who had not yet dropped to the floor, was told at gunpoint to "get down."[17] Bonn, understandably frightened by this late night entry, apparently fled into the living room adjacent to the foyer.[18] Agent Orebaugh testified that he followed after Bonn, caught him in the living room, and initially placed him in handcuffs until he could be identified.

Moments after the police entered, Victor Cucci was removed from the house in handcuffs and placed on the front porch. The officers remaining in the home then fanned out throughout the entire residence conducting a protective sweep and securing the home pending a search. While the sweep was performed, the Cucci and Bonn families were ordered to stay seated on a sofa located in the living room. There was testimony that the police did this in a belligerent manner. Janet Cucci testified that the families were forced to sit on the sofa for several

13. Agent Orebaugh testified that, "[i]t was implied that [the AK–47] could be wherever the rest of the evidence was. It appeared at the drug transaction. [I] assum[ed] that it followed him where he went. "... I knew that Mr. Cucci had weapons and there was always the possibility that [the AK–47] could have gone with him." (Tr.Vol. I at 78.)

14. Officers were sent from the Covington Police Department to several different locations in order to locate Cucci. These included, among others, his home, the cabin, and the pizzeria. (Tr. Vol. I at 54–55; Vol. II at 292, 303–304, and 318.)

15. The group included: Agent Burke; Agent Orebaugh; Officer Steven Staton from the Beckley Police Department; an unidentified uniformed officer; and either Agent Keaney or Virginia State Officer William Roger Rector, Jr.

16. The delay was due, in part, to the fact that most of the individuals in the home were watching television in the basement. Only Victor Cucci was on the first floor of the residence when the police reached the front door. Cucci testified that, at the time, he was sleeping in the master bedroom. He also claims that it wasn't until his wife called out for him, due to the loud knocking, that he woke up and realized the police where there.

17. Janet Cucci testified that the reason she did not initially drop to the floor was because her five year old son, Marco, had entered the foyer. Terrified at the scene he was witnessing, the boy began to scream and cry for his mother. Nevertheless, the officers refused to let Mrs. Cucci comfort her son and reiterated that she get to the floor. Eventually, Mrs. Cucci disregarded the officers' admonitions and went over and embraced the child, calming him down. There was testimony that, as a result of this incident, the young Cucci boy has experienced emotional problems when separated from his mother for any substantial period of time.

18. There is contradicting testimony regarding Mr. Bonn. According to Orebaugh, when the officers entered the foyer of the home, Bonn ran into the living room. Orebaugh testified that he had to chase after Bonn and, as a result, he initially put handcuffs on him. Bonn testified that he never ran from the foyer and that he was handcuffed for no apparent reason.

hours. During this period, she claims that an armed officer was assigned to watch them and that he forbid them to talk to each other, use the telephone, or access the bathroom. She also testified that she heard officers opening drawers upstairs in the home during the period in which the protective sweep was allegedly conducted.

After a short period on the porch, Victor Cucci was escorted to a police vehicle parked on the street adjacent to the Cucci's property. The government claims that, once Cucci was placed in the police car, he was read his *Miranda* rights.[19] A few minutes later, Agents Burke and Orebaugh left the home and approached the police vehicle. The two agents entered the front seat of the patrol car and handed a written consent form to Cucci. Cucci signed the form which permitted the officers to search his home and two of his cars. Orebaugh testified that no threats were made to obtain the consent and that Cucci's demeanor was apologetic and very cooperative.[20] The consent form was executed at 11:55 p.m. on July 25. Therefore, approximately twenty-five minutes had passed from the time Cucci was arrested

until his consent to the search the residence was obtained.

After getting Cucci to sign the consent form, Orebaugh returned to the house. There he located Special Agent George Gibbs, ("Gibbs"), in the basement of the Cucci's home and asked him to supervise the search. Based on the instructions Orebaugh had given him, Gibbs understood the scope of the search to include money, drugs, weapons, financial records, and other valuables. Assembling a group of seven officers, Gibbs began the search within minutes. The officer's records indicate that the first seizure took place at 12:33 a.m. on July 26. The search of the residence would continue for approximately two and a half hours until 3:00 a.m.[21] After finishing with the home, the officers then searched two of the Cucci's cars. One of the automobiles contained a large quantity of financial records, which took a substantial time to document. As a result, these searches did not conclude until approximately 6:00 a.m. on July 26.[22]

Shortly after the consent to search the home was obtained, Cucci signed three additional consent forms. These forms, which were witnessed by Agent Burke and Lieuten-

19. Orebaugh testified that, after Cucci was read his rights, he indicated that he did not want to talk to the officers. As a result, he claims that the officers refrained from interrogating Cucci. (Tr.Vol. I at 55–56.)

20. The following is the relevant portion of Agent Orebaugh's testimony.

Q. What was Mr. Cucci's attitude at [the time he signed the consent form]?
A. Mr. Cucci, was emotional. At times there were tears forming in his eyes. He was concerned about his reputation in the community and what arrest would do to his reputation. He was concerned about his family and what this would do to his wife and children. Several times he made the statement I really messed up, I screwed up and adjectives to describe that. He was almost apologetic at this point if I was to give a verbal description of his demeanor.
Q. [Court] He wasn't belligerent?
A. No, sir, he was very pleasant, very pleasant.
Q. Was he cooperative or uncooperative?
A. Oh, he was very cooperative.
Q. Was there any threat or promise or any inducement offered to him to get him to sign that consent or to get his consent to search his house?

A. Absolutely not.
Q. Did it take any persuasion?
A. No, sir.
Q. Did he at any point ask for a lawyer?
A. No, sir.
Q. Was there any physical or verbal threat or misconduct or any kind in connection with this questioning of Mr. Cucci?
A. No, sir. (Vol. 1 at 51–52.)

21. Gibbs testified that, during the search, he saw a child asleep in one of the bedrooms and two adults asleep in another bedroom. These individuals were not disturbed, however, a picture was taken of the two adults. At the evidentiary hearing, the individuals in the photo were identified as Mark and Judith Bonn. Gibbs also testified that he saw Agent Burke sitting at the dining room table calmly talking to a woman. This woman was later identified as Janet Cucci.

22. As a result of the searches conducted at the Cucci residence, approximately fifteen thousand dollars, ($15,000.00) was recovered, some of which was marked buy money. In addition, the police seized financial records and several assets believed to be subject to forfeiture. No illegal drugs were ever found at the home, but several guns were seized including a handgun from which the serial number had been removed.

ant Wayne Walker of the Beckley Police Department, permitted the police to conduct searches at Cucci's restaurant, car dealership, and cabin. Lieutenant Walker testified that Cucci was again cooperative and that he made no request for an attorney while he signed these documents. Pursuant to these forms, officers were dispatched from the home to conduct searches. They searched Cucci's cabin and found the AK–47 assault rifle. Searches conducted at the car dealership and the Cucci restaurant resulted in the seizure of additional financial records and assets.

The Defendants present a markedly different picture of how the consent forms were obtained by the police. According to the Defendants, just after Victor Cucci was removed from the home, Agent Burke approached Janet Cucci in the living room carrying a piece of paper in his hand. Burke allegedly told Mrs. Cucci that he was going to go out to the police car and ask her husband to sign the paper. He added that, if Victor Cucci refused, everyone in the living room was "going to have a long wait." Burke then left the home and walked to the police car alone. Reaching the car, Burke asked Cucci to consent to a search of the home. He also told Cucci that, without his consent, it would take at least seven (7) hours to obtain a warrant from a magistrate judge in Charleston, West Virginia. Furthermore, Burke allegedly threatened Cucci, telling him that he would be forced to remain in the car during that period and that his family and guests would not be permitted to leave the living room. Burke assured Cucci that, unless he cooperated, he was going to be embarrassed in the morning when his neighbors saw what was taking place.[23] Cucci also asserts that Burke stated that if he would just cooperate "they could be friends." Cucci claims that, as a result of this pressure, he acquiesced and gave Burke oral consent to search his home. Cucci claims that he did not give written consents until Lieutenant Walker and Agent Burke returned to the car sometime thereafter. Furthermore, Cucci testified that he signed all four of the consent forms at the same time and that, despite the officers knowing he had difficulty reading the English language, none of the forms were ever read to him.

Lastly, Cucci testified that at some point while he was in the police car, he was able to speak with his brother, Maurizio Cucci. He told his brother to contact the family's lawyer, Michael Collins. Collins testified that, after he was contacted, he drove with his wife to the Cucci's residence, arriving around 2:00 a.m. on July 26. Collins further testified that he spoke with a police officer at the scene and told him that he was an attorney who had represented Victor Cucci in the past and that he wanted to know what had happened. The officer, who was later identified as Agent Burke, allegedly responded by telling Collins that, even if he was Cucci's attorney, he should "butt out ... back off and get the hell out of [h]ere."

---

**23.** Victor Cucci testified as follows:

Q. Did Agent Burke tell you anything?
A. ... He said that he needs consent.
Q. [Did he say anything to you before that?]
A. If I don't do that, you know, if I don't give [consent] he said it would take him seven (7) hours or something like that ...
Q. Take him seven (7) hours to do what?
A. To get the warrant. He had to go to West Virginia he told me to go get his warrant. In the meantime, if I don't [sic] give the consent, he said that it [sic] would keep in the car.
Q. Keep you in the car?
A. Right ... In the car until he came back and it [sic] would keep my family, my kids and the guests that we have at the house in the sofa and he will not let them move until he come back with a warrant....
Q. At that time did you believe he meant that?
A. Yes, sir.

Q. Did he say anything about friends?
A. I think he said if you can help me, you know, we can become friends or something in that nature, something like that.
Q. During this period of time when he was talking about how long it was going to take him to get a warrant out of West Virginia and hold your family and hold you in the car, did he say anything about the neighbors and stuff like that being around the next day?
A. Yes, sir. If you do not agree to do this, I'm going to let you sit in the car until I come back which it can be [sic] ten o'clock (10:00) or whatever, you know. And then everybody will see you in the neighborhood and you don't want to be embarrassed like that ...
Q. As a result of what he told you that he was going to do, did you end up giving consent?
A. Yes. (Vol. III at 21–23.)

## Analysis

The Fourth Amendment prohibits law enforcement officers from conducting *unreasonable* searches and seizures. Nowhere is this constitutional principal more stringently observed then when the search or arrest at issue takes place in the confines of an individual's home without the benefit of a warrant. *See Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting) *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("[The] physical entry of the home is the chief evil against which the wording of the [first clause] of the Fourth Amendment is directed."); *see also Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) ("[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.").

■ This fundamental concern for the sanctity of the home was the impetus for the Supreme Court's decision in *Payton v. New York*. There, the Court held that non-consensual entry into a domicile for the purposes of effecting a warrantless arrest is presumptively unreasonable, absent a showing by the government that probable cause and exigent circumstances exist. *Payton*, 445 U.S. at 590, 100 S.Ct. at 1382 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). In this case, it is conceded that the government agents arrested Victor Cucci in his home without an arrest warrant. Therefore, in order to overcome the *Payton* presumption, the government must show, by a *preponderance of the evidence*, that the officers had probable cause to arrest Victor Cucci and that exigent circumstances existed. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972).

## I. *Probable Cause to Arrest*

■ Little needs to be said with respect to the police officers' belief that there was probable cause to arrest Cucci for the commission of a felony. Probable cause to arrest exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). It is clear to the court that this standard has been met. By the time the arrest team had arrived at the Cucci home, they had already witnessed Victor Cucci sell two kilograms of cocaine to their informant. Furthermore, police investigators who were at the car dealership and the cabin, monitored and recorded these events as they took place.

## II. *Exigent Circumstances*

The question of exigency is more difficult. The federal courts have encountered the exigent circumstances doctrine in a wide variety of factual contexts. Unfortunately, although the United States Supreme Court has recognized the exigency exception, the Court has never attempted to articulate the scope of the doctrine. *See United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (hot pursuit of a suspected felon); *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (threat to human life); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (imminent destruction of evidence); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (possible flight of suspect). This in turn, has persuaded at least two Federal Appellate Court's to identify specific factors traditionally used in making determinations about police exigency. *United States v. Rubin*, 474 F.2d 262 (3rd. Cir.), *cert. denied, Agran v. United States*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970) (en banc). Those factors include:

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant;

(2) the officers' reasonable belief that the contraband was about to be removed or destroyed;

(3) the possibility of danger to police guarding the site;

(4) information indicating the possessors of the contraband were aware that the police were on their trail;

(5) the ready destructibility of the contraband;

*Rubin,* 474 F.2d at 268–69,

(6) the gravity of the offense involved;[24]

(7) was the suspect reasonably believed to be armed;

(8) can a clear showing of probable cause be made beyond what would be necessary for the issuance of a warrant;

(9) was there a strong reason to believe that the suspect was in the premises;

(10) the likelihood that the suspect would escape if not swiftly apprehended;

(11) was the entry, though not consented to, made peaceably; and

(12) the time that the entry was made;[25]

*Dorman,* 435 F.2d at 392–93,

■ Upon review of the Fourth Circuit's decisions examining the issue of exigency, it appears that the five factors annunciated in

*Rubin* have been routinely followed. *See United States v. Reed,* 935 F.2d 641, 642 (4th Cir.), *cert. denied,* 502 U.S. 960, 112 S.Ct. 423, 116 L.Ed.2d 443 (1991); *United States v. Owens,* 848 F.2d 462, 470 n. 4 (C.J. Winter, dissenting) (4th Cir.1988); *United States v. Turner,* 650 F.2d 526, 528 (4th Cir.1981). However, as the *Rubin* Court emphasized when it created the list and the Fourth Circuit has reiterated in applying it, these factors are not intended to be an exhaustive set of mandatory requirements. Additionally, although all of the factors are relevant, no single one is dispositive or controlling. *See Reed,* 935 F.2d at 642 ("There is no precise formula since emergency circumstances will vary from case to case and the inherent necessities of each situation must be scrutinized."). Similarly, the Federal Circuit Court of Appeals has recognized that the factors listed in *Dorman* are not to be read as compulsory. *See United States v. Lindsay,* 506 F.2d 166, 172 (D.C.Cir.1974).

■ The proper approach is for a court to remain flexible in its analysis. In the end, the final decision must rest not on a single factor or group of factors, but rather on the court's perception of the "totality of the circumstances" at the time the arrest was made. *See United States v. Jones,* 635 F.2d 1357, 1361 (8th Cir.1980) ("[T]he *Dorman* analysis is [a] guideline, rather than an absolute test for the presence of exigent circum-

---

**24.** The Supreme Court, in *Welsh v. Wisconsin,* 466 U.S. 740, 751, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984), recognized *Dorman* as "a leading federal case defining exigent circumstances." *See also* 2 Wayne R. Lafave, *Search and Seizure* § 6.1(f) at 595 (2d ed. 1987) (Describing the *Dorman* test as, "[t]he most ambitious attempt to articulate the ... factors which bear upon the exigent circumstances issue....") While the *Welsh* Court declined to approve of all the factors listed in *Dorman,* it expressly adopted the first factor-the gravity of the offense. "[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh,* 466 U.S. at 753, 104 S.Ct. at 2099.

**25.** As the *Dorman* Court readily admitted, the time of entry is of questionable relevance in the exigency determination.

> Another factor to be taken into account, though it works in more than one direction, relates to time of entry-whether is made at

night. On the one hand, ... the late hour may underscore the delay (and perhaps impracticability of) obtaining a warrant, and hence serve to justify proceeding without one. On the other hand, the fact that an entry is made at night raises particular concern over its reasonableness, ... and may elevate the degree of probable cause required, both as implicating the suspect, and as showing that he is in the place to be entered ... *Dorman,* 435 F.2d at 393.

In this case, the nighttime entry into the Cucci's residence involved a greater intrusion on the family's protected privacy interests than would have occurred if it had taken place during the day. At the same time, the lateness of the hour increased the urgency in affecting Cucci's arrest, the probability that a warrant could not be obtained, and the likelihood that Cucci would be at his residence. Based on these observations, the court believes the factor should be excluded from the exigency analysis because it does not definitively favor either sides position.

stances, because such a determination ultimately depends on the unique facts of each controversy."); *see also Reed*, 935 F.2d at 643 (exigency must be viewed from a totality of the circumstances known to the officers at the time of the warrantless arrest).

With these principles in mind, the court now turns to the facts in the instant case. At the outset, the court would note that it believes the issue of exigency to be a close question. Nonetheless, the court finds that a majority of the factors favor the Defendants' contention that exigent circumstances did not exist.

■ First, the court believes there was sufficient time for the agents to obtain warrants prior to arriving at the Cucci's residence. (*Rubin* factor one). The government has argued that, following Covello's arrest, the "principal investigators" did not return to the Covington Police Department until 11:00 p.m. Only then, the government contends, did Agent Keaney have sufficient knowledge of Cucci's location and the facts surrounding Covello's arrest to reasonably seek warrants.[26] In addition, because the investigation was under the direction of the DEA, the government claims that the officers were prohibited from obtaining the warrants from the state magistrate judge sitting in Covington.[27] Instead, the government insists that the warrants had to be issued by a state court of record or a federal magistrate. *United States v. Williams*, 977 F.2d 866, 870 (4th Cir.1992) (citing *United States v. Smith*, 914 F.2d 565, 569 (4th Cir.1990)). This process, it contends, would have taken between thirty minutes to one hour. Therefore, the government concludes, the officers "did not have time, given the lateness of the hour and the remoteness of the location, to get arrest and search warrants." (Mem. in Opp. at 9.)

■ The court cannot accept this argument.[28] The critical issues to be determined are at what point in their investigation should the agents have been expected to seek warrants and what procedures were available to facilitate their issuance at that time. *See* 2 W.R. Lafave, *Search and Seizure* § 6.5(b) at 662 (2d ed. 1987). The police are not required to obtain a warrant the moment they believe they have probable cause to make an arrest or to conduct a search. *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). In addition, the failure to obtain a warrant at the earliest moment does not necessarily preclude a subsequent arrest or search based upon exigent circumstances. *Cardwell*, 417 U.S. at 595–96, 94 S.Ct. at 2472 ("The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does

---

26. As support for this contention, the government cites the following testimony of Agent Keaney:

> Q. ... You waited from nine-thirty (9:30) to about eleven (11:00) when I understand everybody went out to arrest Mr. Cucci?
> A. I waited till [sic] all the officers returned from the arrest of Mr. Covello to bring back the money list, discuss with me what had taken place, to advise me. I mean, there could have been all kinds of things transpiring. Until I actually talked to those people firsthand, I had no intention of doing other than that, you know, to find out what the exact facts were. I did not have contact with those individuals. (Tr.Vol. I at 243.)

27. **Rule 41. Search and Seizure—(a) Authority to Issue a Warrant.** Upon the request of a federal law enforcement officer or an attorney for the government, a search warrant may be authorized by this rule may be issued (1) by a federal magistrate judge, *or a state court of record* within the federal district. ...

Fed.R.Crim.P. 41(a).

28. One reason the court must reject the government's argument is because it is based on misreading of the testimony presented during the evidentiary hearing. The government cites the testimony of Agent Orebaugh as support for its contention that the "principal investigators" did not reach the Covington Police Department until 11:00 p.m. However, a careful reading of Orebaugh's testimony reveals that is not what the officer stated.

> Q. What time did you arrive at the [Cucci's] house?
> A. We left—Excuse me. We arrived at the police department in Covington, I'm thinking *it was right around eleven o'clock (11:00) by the time we compared the bills that we seized from Joseph Covello to the marked money and got the arrest team together and assignments.* It was pretty close to eleven-thirty (11:30) by the time we got to Mr. Cucci's house. (Tr.Vol. I at 41.) (emphasis added)

Furthermore, both Officer Gibbs and Agent Keaney testified that they believed Covello's arrest team, including Orebaugh, had arrived back at the police station around 10:00 p.m. *See* (Tr.Vol. I at 189 and 242–43.)

not negate the possibility of current situation's necessitating prompt police action."); *United States v. Webster*, 750 F.2d 307, 327 (5th Cir.), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1984); *United States v. Gardner*, 553 F.2d 946, 948 (5th Cir.), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1977). Moreover, a postponement in obtaining a warrant is appropriate when the purpose for the delay is to "ferret out any hitherto unknown individuals involved in the illicit undertakings, gather additional evidence substantiating the crimes believed to have been committed, or discover any other offenses in which the suspects are involved." *United States v. Hultgren*, 713 F.2d 79, 87 (5th Cir.1983); *see also United States v. Webster*, 750 F.2d 307, 328 (5th Cir.1984).

■ However, there is a certain point after which a continued delay in obtaining a warrant no longer serves a legitimate investigatory purpose, but rather, becomes an unjustifiable creation of exigent circumstances on the part of the police. *United States v. Campbell*, 945 F.2d 713, 715 (4th Cir.1991) (exigency is not shown where police unnecessarily delay in seeking a warrant); *United States v. Collazo*, 732 F.2d 1200, 1204 (4th Cir.), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1984) ("[The] government will not be allowed to plead its own lack of preparation to create an exigency justifying warrantless entry."); *United States v. Curran*, 498 F.2d 30, 34 (9th Cir.1974) ("If exigency arises because of unreasonable and

deliberate delay by officers, it is not an exigent circumstance capable of dispensing with the requirement of a warrant."); *see also* 2 Wayne R. Lafave, *Search and Seizure* § 6.1(f) at 600–605 (2d ed. 1987) (explaining the difference between a "planned" arrest where a criminal investigation has been completed and one where the arrest is made in the course of an ongoing investigation in the field).

The court believes that is exactly what took place in this case. At approximately 9:30 p.m., Agent Keaney knew that Covello had been arrested and that Victor Cucci had returned to his residence.[29] Thus, according to Keaney's own testimony, the condition precedent to arresting Cucci occurred approximately an hour and a half prior to the time the agents decided to depart for the Defendant's residence. There was no tenable reason for this delay because all of the parties suspected to be involved in the drug transaction had already been identified and additional evidence of Cucci's criminal involvement was not needed.[30] Therefore, even assuming the officers were precluded from obtaining the warrants from the state magistrate in Covington, there was no reason why the warrants could not have been obtained in Roanoke or another surrounding area pursuant to Rule 41(a). In addition, the government has failed to provide a credible explanation for why the option of obtaining the warrants by oral application was not considered.[31]

29. Keaney testified that he was able to maintain direct contact with Covello's arrest team by 9:30 p.m. He also testified that it was sometime after 9:00 p.m. that he first learned that Cucci's car had been spotted at his residence. (Tr. Vol. I at 257.)

30. While the recovery of marked buy money from the Cucci's residence undoubtedly strengthened the government's case against the Defendant, it cannot be seriously argued that it was necessary for the issuance of an arrest warrant.

31. The only explanation provided by the government is the conclusory statement in its brief that there was an insufficient amount of time to either prepare a duplicate original warrant or have oral testimony recorded by a federal magistrate. (Mem. in Opp. at 16.) *See* FED R.CRIM.P. *41(c)(2).* The court finds this explanation inadequate. By enacting Rule 41(c)(2), Congress demonstrated

its strong preference for having law enforcement officials operate pursuant to warrants. As such, courts have been reluctant to find exigent circumstances when the government fails to show that obtaining a warrant telephonically was unrealistic. *See United States v. Alvarez*, 810 F.2d 879, 882 (9th Cir.1987) ("[T]he government's burden is not satisfied 'unless [it] demonstrates that a warrant could not have been obtained in time even by telephone under the procedure authorized by Fed.R.Crim.P. 41(c)(2).' ") (citation omitted); *see also United States v. Ogbuh*, 982 F.2d 1000, 1004 (6th Cir.1993) ("[I]t is not clear that an hour would have been required to obtain the warrant by telephone had reasonable procedures been used.") The court does not mean to suggest that officers will always have time to obtain warrants by oral application. However, the enactment of Rule 41(c)(2) clearly was intended to curtail the instances in which officers are forced to make judgment calls as to whether

▆ Second, there was no justifiable basis for the agents to believe that Cucci knew his arrest was imminent or that he was likely to destroy evidence and flee the area. (*Rubin* factors two and four and *Dorman* factor ten.) The government asserts that the officers feared "word of Covello's public arrest on the Interstate would reach Cucci, or that someone overheard the radio-transmitted communications concerning his arrest or Covello or someone else at the jail would notify Cucci...."[32] (Mem. in Opp. at 9.) Therefore, the government reasons there was a great likelihood that "Cucci would learn of Covello's arrest and destroy or secrete evidence, namely, the missing buy money, the missing cocaine, and the AK–47 at the cabin." *Id.* at 14.

Again, the court cannot agree. There are instances when it is reasonable for the police to take immediate action because they believe a suspect has or will quickly learn of his coconspirator' apprehension and begin to destroy critical evidence. Typically this is true when the suspect is in close proximity to the initial arrests, *Turner*, 650 F.2d at 528 (warrantless entry proper because arrest of codefendant occurred in lighted parking lot within view of suspect's apartment); *United States v. Forker*, 928 F.2d 365 (11th Cir.1991) (warrantless entry proper because agents observed suspect peering out of motel window while arrest of codefendant was taking place), or when the police know the suspect is awaiting the return of his associates. *United States v. Gordils*, 982 F.2d 64 (2nd Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 1953, 123

L.Ed.2d 657 (1992) (seller arrested and it was known that "others inside the apartment were awaiting his return with the proceeds of the sale ... those inside likely to flee."); *United States v. Moore*, 790 F.2d 13 (1st Cir.1986) (failure of associates to return to the apartment promptly with drug proceeds created substantial risk that suspect would flee or destroy evidence).

Neither situation is present in this case. Covello was leaving the area at the time he was arrested. Thus, there was no reason for the officers to believe that Cucci was expecting Covello to return to his residence or that Covello's detainment would cause Cucci to become suspicious. Further, Covello's arrest was coordinated so that it would take place on an isolated section of the highway thirty miles outside of Covington. Although the court believes Agent Orebaugh was justified in using an unsecured radio frequency to coordinate the arrest, it is pure speculation on the part of the government to argue that the radio transmissions could have been picked up on a police scanner and relayed to Cucci. As the Defendants' have correctly noted, there is no evidence to suggest that Cucci, or anyone he knew, was in possession of such a scanner. Furthermore, the court finds the government's argument that Covello or Musso could have phoned Cucci from jail to be frivolous. *See United States v. Lynch*, 934 F.2d 1226 (11th Cir.1991) ("The police ... simply assumed that [the suspects] would grow suspicious if they did not hear from their coconspirator. Such speculation,

---

exigency exists and warrantless arrests or searches are permissible. Suffice to say, in this case, the court is convinced that the officers simply did not consider this option.

**32.** These arguments are based on the testimony of Agents Orebaugh and Keaney.

Court: [Agent Orebaugh], if [Cucci was] at home and in his house how was he going to find out about the arrest of Mr. Covello?
A: Through the radio traffic that had been broadcast, people with scanners, the possibility of Mr. Covello either calling from the regional jail or having another inmate call. (Tr. Vol. I at 47.)

    *   *   *   *   *   *

Q. [Agent Keaney] you indicated that you were concerned about Mr. Covello ... contacting Mr. Cucci?

A. That was a concern of mine., that's correct.
Q. Why couldn't you have secured Mr. Covello for a period of time and prevented him from making a phone call for a few hours ...?
A. ... I've been an agent for twenty-four (24) years and I'm absolutely amazed at what local jails will do ... I'm absolutely amazed that within one (1) hour often times they allow people to make phone calls ... I've seen it dozens of times. (Tr. Vol. I. at 250.)

without any factual support, will not suffice to overcome the warrant requirement."); *see also United States v. Marshall*, 488 F.2d 1169, 1190 (9th Cir.1973) (although co-defendants had been arrested earlier, they "were in custody and had no way to communicate with the occupants."). If the possibility of Covello and Musso contacting Cucci was truly a concern, Agent Keaney could have easily instructed officials at the Rockbridge County Regional Jail to keep them isolated from the general prison population until Cucci's arrest was accomplished. This was never done and the officers' failure to do so cannot support their claim of exigency.

■ At its essence, the government's argument is based on the mere fact that the officers' believed Cucci was in possession of evidence that was readily destructible. That fact, standing alone, will not support a finding of exigency. *United States v. Lalor*, 996 F.2d 1578, 1584 (4th Cir.), *cert. denied*, ── U.S. ──, 114 S.Ct. 485, 126 L.Ed.2d 436 (1993) ("Requiring that there be a particularized basis" for the police's belief that evidence will be destroyed and stating, "[t]here is no support for the proposition that each and every narcotics search carries a risk that evidence will be destroyed ... [s]uch a rule would totally eviscerate the Fourth Amendment, and could easily be expanded to include searches for any item that is easily disposed of."); *United States v. Salgado*, 807 F.2d 603, 609 (7th Cir.), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1986) ("[A] mere possibility that evidence will be destroyed—a possibility that exists any time a drug dealer is arrested outside of his home or other place of (illicit) business—is not enough ... [o]therwise the requirement of a warrant would have little meaning in the investigation of drug crimes. A man who lived in New York might be arrested on a trip to Florida, and the police would argue that they could search his home in New York; maybe he had an arrangement with confederates there whereby if he didn't call in at stated intervals they should clear out with all the evidence."); *United States v. Allard*, 600 F.2d 1301, 1304 (9th Cir.1979) (no facts on which to base a reasonable belief that suspect knew his associate had been previously arrested or had been instructed to

destroy drugs). Therefore, the court finds that the government has failed to present facts from which an objective officer could reasonably believe Cucci knew the police were "on his trail" or that he was likely to destroy evidence. *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir.), *cert. denied*, 500 U.S. 945, 111 S.Ct. 2245, 114 L.Ed.2d 486 (1991).

■ Third, despite the fact that Cucci had access to firearms, the court finds that the possibility of danger to the police guarding the site was minimal. (*Rubin* factor three and *Dorman* factor seven). It was conceded during the evidentiary hearing that the agents knew Cucci had a reputation for being a non-violent person. (Tr.Vol. 1 at 137.) Furthermore, there was testimony that Cucci was a personal friend of several of the officers present at the arrest scene. (Tr. Vol. I at 77–78.) Based on these facts and the sheer number of officers that were present, the court cannot say that a significant threat to the officers' safety existed or that a potentially violent situation was at hand.

■ Fourth, it is beyond dispute that the agents' entry into the Cucci's home was far from peaceable. (*Dorman* factor eleven). While the court appreciates the hazards inherent in undercover drug investigations and the fact that officers are routinely asked to put their lives at risk to protect our communities, in this case the agents' conduct cannot be condoned. There were six individuals in the home whom the agents knew had no direct involvement in the drug transaction. Of those six, two were women and three were children. Nevertheless, the police entered the home brandishing weapons and forced Janet Cucci to lie face down on the ground with a gun to her head. This occurred without any form of resistance being demonstrated on her part and while her child stood less than ten feet away screaming and crying in fright. Further, all of the individuals remaining in the home were later rounded up and, in hostage-like fashion, forced to remain isolated on a sofa in the living room. This lasted for an extended period of time and it appears that they were given little, if any, explanation of what was taking place.

As the court stated during oral argument, there is simply no excuse for this type of police activity. An abuse of authority such as this, "breeds contempt and disrespect for the law and hatred for law enforcement officers." *United States v. Carter*, 566 F.2d 1265, 1277 (5th Cir.) (S.J., Skelton, concurring), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). "No citizen of this country who has committed no crime and offers no resistance should be subjected to the abuse and treatment the occupants of the house received at the hands of these officers." *Id.* The court can only hope that the high-handed tactics used in this instance were an aberration brought on by the seriousness of the crimes at issue, rather than the accepted practice of the agents involved.

From what has already been said, a discussion of the remaining factors does not need to be presented.[33] As the court has already indicated, a majority of the traditional factors used to determine exigency favor the Defendants' position. However, the court does not base its decision solely on the Defendants' ability to meet any specific factor or test. Wholly apart from a mechanical weighing of factors, the court believes that when the circumstances surrounding the officers' entry into the Cucci home are viewed collectively, they fail to suggest that an emergency situation existed. Therefore, the court finds that the government has failed to prove by a preponderance that the officers were faced with exigent circumstances.

### III. *Consent to Search*

It is well established that where valid consent has been given a search may be conducted without probable cause or a warrant. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Gordon*, 895 F.2d 932 (4th Cir.), *cert. denied*, 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). Additionally, when the prosecution relies upon a defendant's alleged consent to justify the lawfulness of a search,

it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). However, unlike the waiver of other constitutional rights, the government is not required to show that an individual's consent to a search was knowingly or intelligently given. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59. Rather, the critical issue is whether, in light of all the circumstances, the consent was a product of the individual's free will. This in turn requires an inquiry into whether the consent was influenced by express or implied police coercion or by the coercive nature of the physical environment in which it was given. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Bumper v. North Carolina, supra.* As Justice Stewart writing for the majority in *Schneckloth* explained:

> [T]he question whether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. . . . In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. . . . [I]t is only by analyzing all of the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is the careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches.

In this case, the court is not asked to perform an analysis of whether some subtle form of police questioning rose to the level of coercion invalidating a consent search. Here, the lines have been more disparately

---

**33.** The factors that the court believes favor the government are: the destructibility of the contraband; the gravity of the offense involved; a clear showing of probable cause beyond what would

be necessary for the issuance of a warrant; and a strong belief that the suspect was in the premises. (*Rubin*, factor five, *Dorman* factors six, eight, and nine).

drawn. When Victor Cucci testified, he categorically denied that his consent was voluntary. He explained that it was only after threats were made by Agent Burke that he decided to acquiesce and sign the consent forms. This testimony was corroborated by Janet Cucci's claim that Burke made similar threats to her before leaving the home and seeking her husband's consent. By contrast, the two police officers who witnessed the consent forms testified that they had no knowledge of Victor Cucci ever being threatened or subjected to police interrogation. They also stated that Cucci never mentioned Burke's alleged misconduct. Furthermore, both agreed that Cucci was very cooperative when he signed the documents.

There is no easy resolution to this conflict. Because of the contradictory nature of the testimony presented to the court, the voluntariness of Cucci's consent necessarily requires a determination on the credibility of the witnesses. In reaching a credibility determination, the court must also take into account the fact that the government failed to call Agent Burke as a witness. As is evident from even a superficial reading of the facts in this case, Agent Burke played an instrumental role in the acquisition of the consent forms. His failure to testify must, at least to some degree, be viewed as adding credibility to the testimony of the Defendants.

Having thoughtfully reviewed the testimony of *all* of the witnesses and considered the government's burden of proof on this issue, the court finds the Defendants' rendition of the events more credible. The court does not base its decision solely on the govern-

ment's failure to call Agent Burke to the stand. Particularly persuasive to the court is the testimony of Michael Collins. Collins' description of the hostile manner in which Burke addressed him is consistent with Victor and Janet Cucci's testimony about Burke's demeanor on the evening of the arrest. The court simply cannot accept the government's claim that the Defendants' testimony should be disregarded as "self-serving." Nor can it accept the government's position that the testimony of the other officers sufficiently established that Agent Burke never made threats against Victor Cucci and his family. Therefore, the court finds that Victor Cucci's consent was the product of express police coercion rather than his own free will. The searches conducted pursuant to that consent must be held invalid.[34]

## IV. *Scope of the Searches Conducted*

■ Even if the court were to agree with the government that exigent circumstances existed justifying the warrantless arrest and that Victor Cucci's consent was given voluntarily, at least some of the evidence seized by the officers would still have to be suppressed because the scope of the searches was overly broad. The scope of a consent search is determined under an objective reasonableness standard, rather than the subjective beliefs of either the defendant or the officer. *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). That is, the court must determine what a reasonable person would have understood from the interchange between the officer and the suspect. *Id.* It is conceded that, at the time the agents asked Victor Cucci for con-

---

34. Aside from Burke's threats, the court believes there is additional evidence which supports the Defendants' contention that Cucci's consent was involuntary. This includes: Cucci's difficulty in reading the English language, *see United States v. Rodriguez,* 525 F.2d 1313 (10th Cir.1975) (involuntary, emphasizing that the defendant "understood little English"); his lack of formal education; his limited intelligence; and his unfamiliarity with the criminal justice system, *see People v. Gonzalez,* 39 N.Y.2d 122, 383 N.Y.S.2d 215, 347 N.E.2d 575 (1976) (defendants had "very little prior contact with the police").

In addition, the court would also note that Cucci's arrest occurred late at night after an extreme show of force by the police. *See United*

States v. Jones, 641 F.2d 425 (6th Cir.1981) (five officers with two shotguns and pistols drawn were "overpowering police presence"). Further, Cucci was under close restraint at all times, having been handcuffed and placed in the back seat of a police car immediately after he was arrested. *See United States v. Rothman,* 492 F.2d 1260 (9th Cir.1973) (defendant handcuffed and held under close restraint after his arrest). Lastly, the consent forms which Cucci signed did not inform him that he had a right to refuse the officers' request. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (suspect knowledge that he has the right to refuse is a factor to be considered but not determinative by itself).

sent to search his home, he had been informed that he was under arrest for drug distribution. As such, the Defendants argue that a reasonable person would believe that the federal agents were interested in searching for drugs and perhaps money, but not financial records.

The court agrees. The consent forms which Cucci signed did not limit the search to a particular section of the home or identify the purpose for the search. They were, as the government contends, "open-ended." In addition, Agent Orebaugh testified on both direct and cross examination that, when the officers discussed the search with Cucci, he indicated that his consent was unqualified.[35] Therefore, the police had received not only written consent forms which indicated that there was no limit on the scope of their search, but also oral confirmation of that fact from Cucci himself.

However, even when empowered with consent as ostensibly broad as this, the seizure of financial documents is still impermissible if the only known objective was the officers' interest in searching for drugs. In *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971), the Seventh Circuit addressed this very issue. In *Dichiarinte*, the defendant had been arrested for drug distribution. In response to police questioning about whether he had narcotics in his home, the defendant responded, "I have never seen narcotics ... [y]ou guys come over to the house and look, you are welcome to." *Id.* at 128. A short period after the search had begun, the defendant was advised by a friend present at the scene that he did not have to acquiesce to the search. In response to the admonition, the defendant stated, "[t]hat is alright, I told them they could search ... they are not going to find any narcotics in here." *Id.* The police then continued their search eventually seizing a large quantity of financial

documents from the defendant's home. Thereafter, the defendant was convicted on two counts of tax evasion.

In reversing the tax convictions, the Seventh Circuit assumed that the defendant's consent had been given voluntarily. Nevertheless, the *Dichiarinte* Court found the search to be violative of the Fourth Amendment. In reaching this conclusion, the Court wrote:

> Under these circumstances, defendant's statement that the agents could 'come over to the house and look' must be taken to mean at most that they might come and conduct only such a search as would be necessary to establish whether he had narcotics. Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search ... A consent search is reasonable only if kept within the bounds of the actual consent. In the case before us the defendant's consent set the parameters of the agents' conduct at that which would be reasonably necessary to determine whether he had narcotics in his home. But the agents went beyond what was necessary to determine whether defendant had hidden narcotics among his personal papers; they read through those papers to determine whether they gave any hint that defendant was engaged in criminal activity. This was a greater intrusion into the defendant's privacy than he had authorized and the fourth amendment requires that any evidence resulting from this invasion be suppressed. *Id.* at 129–30.

■ The *Dichiarinte* Court's reasoning applies with equal force to the facts in this case. The consent form signed by Cucci and

---

**35.** Agent Orebaugh testified as follows:

Q. Was there any limit placed on the consent by Mr. Cucci?

A. No, sir. He made a statement to the effect that we could do anything we wanted to do with him referring to the consent search. (Tr. Vol I Orebaugh at 52.).

Q. What was the scope of the search?

A. Contraband to include the weapons ... any drugs, the money that—the marked money

that we hadn't recovered yet. Part of the search was financial records. [sic] When we talked with Mr. Cucci there were no stipulations on what we could look for and what we could not look for or where we could look and could not look which, you know, left it wide open as far as I was concerned. (Tr.Vol. I Orebaugh at 129.)

his statements concerning the scope of the search were predicated on the understanding that he had been arrested for drug distribution, not money laundering or tax evasion. Therefore, the court believes it was reasonable for Cucci to assume that the agents' searches would be limited to drugs and the proceeds from the undercover buy.

### Conclusion

In a suppression hearing, a district court must resolve conflicts in testimony, assess credibility, and draw conclusions. With respect to the present case, the court has been called on to make several difficult decisions regarding the late night encounter at the Cucci's residence on July 25, 1991. Nevertheless, having done so, the court finds that it must grant the Defendants' motions to suppress.

It is the opinion of the court that the government has failed to show by a preponderance of the evidence that the warrantless arrest of Victor Cucci was justified by exigent circumstances. In addition, the court finds that Cucci's consent was not given voluntarily. Furthermore, even if it could be said that exigency existed and Cucci's consent was the product of his own will, the court believes the scope of the searches that were conducted was overly broad. An appropriate order shall be entered this day.