**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HILDA MCCARN, individually and as
Administratrix of the Estate of
Terry McCarn, deceased; JACK
MCCARN,
Plaintiffs-Appellants,

v.

KEN BEACH, Chief of Gaston County
Police Department; TOMMY FULLER;
JEFF ISENHOUR, individually and in
their official capacity as members
of the Gaston County Police
Emergency Response Team; GASTON
COUNTY, NORTH CAROLINA, a North
Carolina municipality; DOUGLAS

IVEY,
Defendants-Appellees,

and

TALMADGE MCINNIS, individually and
in his official capacity as a member
of the Gaston County Police
Emergency Response Team; BOB
HARRIS, individually and in his
official capacity as a member of the
Gaston County Police Emergency
Response Team; ARCHIE
HUFFSTETLER, Captain of the Gaston
County Police Department,
Defendants.

No. 95-2312

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
H. Brent McKnight, Magistrate Judge.
(CA-94-49-3-McK)

Argued: April 4, 1996

Decided: July 15, 1996

Before NIEMEYER, HAMILTON, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Fred William DeVore, III, DEVORE & ACTON, P.A., Charlotte, North Carolina, for Appellants. Frank Bayard Aycock, III, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Troy J. Stafford, DEVORE & ACTON, P.A., Charlotte, North Carolina, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiffs Hilda and Jack McCarn appeal from a magistrate judge's decision in this section 1983 case stemming from the shooting death of their son, Terry McCarn.[1] Defendants (and appellees) are Gaston County, North Carolina; Ken Beach, who was sued in his official capacity as Chief of the Gaston County Police Department; and three police officers, Tommy Fuller, Jeff Isenhour and Douglas Ivey, each

_____

[1] The district judge referred the case to the magistrate judge under 28 U.S.C. § 636(c)(1) for all proceedings, including entry of final judgment.

2

of whom was sued individually and in his official capacity. Plaintiffs argue that the magistrate judge erred by granting summary judgment in favor of defendants on the basis of qualified immunity and an absence of municipal liability. Finding no error, we affirm.

I.

This lawsuit stems from the events of July 10, 1993, when Terry McCarn was shot and killed by two police officers. Terry was forty-five at the time of his death. At the age of three he was involved in a tricycle accident that caused a disabling brain injury. As a result, Terry was epileptic and prone to seizures. He had an IQ of around sixty-two. Terry lived with his elderly parents in a cinderblock house that had only one door. Terry's brother, Mike, lived in a house approximately 150 yards from his parents' home.

On July 10, 1993, a hot Saturday, Terry and Jack were at Mike's house. Terry became upset at Mike and his father for doing some plumbing repairs without him. Terry, who was carrying a double-barrelled shotgun, demanded that his father walk with him to their house.

At 11:28 a.m., after Terry and his father left, Mike called 911. The following conversation took place:

> Dispatcher: Gaston County 911. . . . Do you have an emergency?
>
> Mike: Uh. Yes ma'am. Uh. This is Mike McCarn. My brother is up there, he's got epilepsy. He's got a shotgun after my dad.
>
> D: Okay. Where is this at?
>
> M: On Rhyne Road up in Stanley, coming out of Stanley. . . .
>
> D: What's your brother's name?
>
> M: Terry McCarn.

3

D: They out in the yard?

M: Yeah. He's got a gun out there. I don't know what he's going to do. I tried to stop him. I don't know what he's going to do. I need somebody to hurry quickly.

During the walk to his parents' house, Terry fired the shotgun into the top of a tree and told his father, "that should teach you a lesson." The father later said that at no time did he feel threatened by Terry. When they arrived at home, Jack sat on the porch swing while Terry joined his mother inside the house.

A Gaston County police officer, J.D. Costner, answering the dispatch, arrived at the McCarn house ten to twenty minutes after Terry had gone inside. Jack asked Officer Costner to leave. Rather than leaving, the officer refused to let Jack return to the house and called (over a public address system) for Terry's mother, Hilda, to come outside, but she did not respond. While Hilda was in the house, neither she nor Terry responded to the efforts by the officers to communicate with them by telephone or public address.

Hilda was still in the house when Assistant Chief Tommy Fuller arrived at 12:50 p.m. The situation was reported to him as a "hostage" situation. He was also told that Terry had fired a gun "at or over his dad." Fuller had known Terry for years and knew he had epilepsy. During a similar incident in 1986, Fuller talked Terry into coming out of a house unarmed when he had been informed that Terry was armed.

Captain Douglas Ivey, who arrived at 1:21 p.m., was told "there was a hostage situation at the McCarn residence." He was told "Terry McCarn had taken his dad at gunpoint, had already fired a shotgun a couple of times, and that Terry McCarn's mother was still in the house with him and the gun." Similarly, Officer Jeff Isenhour, who arrived at 1:13 p.m., was led to believe there was a hostage situation.

Hilda finally came out of the house at around 2:00 p.m. By this time, twenty-eight officers had arrived at the scene and surrounded the house. The parties dispute what Hilda told the officers upon

4

emerging from the house. But according to Hilda she never referred to herself as a hostage. "I never told any officer that Terry would not let me come outside the house. The windows and storm windows were closed in the house. I never heard a request for me to come outside." Defendants say that Hilda said Terry was sitting on the living room floor, holding the shotgun in his lap. In any event, Hilda was not permitted to reenter her house.

Meanwhile, unsuccessful attempts were made to contact Terry by telephone and over public address speakers. At some point thereafter, Assistant Chief Fuller walked from the yard to the porch railing and called to Terry in an unsuccessful attempt to establish communication.

At about 3:15 p.m. the police arranged for the electricity to the house to be disconnected. According to Officer Ivey, the officers did this because they were concerned for Terry's health and safety. Since it was 106 degrees outside and the house was unshaded, they felt that turning off the power (in case Terry had a fan on) would drive him from the house. This effort failed, and the officers became concerned that Terry might be suffering from heat exhaustion. The officers then warned Terry that they were going to introduce pepper gas into the house. They reasoned that the pepper gas would force Terry out of the house and at the same time force him to abandon his weapon. They also reasoned that if he did not exit the house, they would know that he had been disabled by the heat.

Around 4:00 p.m. two officers broke a window in the rear of the house and began to introduce the pepper gas. In response, Terry fired a shotgun once through the broken window, and the officers retreated. After a second deployment of gas, Terry emerged from the house carrying a shotgun. He yelled at the police and told them to leave or "somebody was going to get shot." Terry walked down the steps and out into the yard towards the end of the porch. As he turned the corner of the house, he saw Officer Harris and began leveling his shotgun at him at a range of just a few feet. Three weapons fired, those of Officer Harris, Officer Isenhour, and Terry. Terry was fatally shot.

Terry's parents, Hilda and Jack, filed suit under 42 U.S.C. § 1983. In a lengthy opinion, a magistrate judge granted summary judgment

5

in favor of Gaston County and each defendant in his official capacity because the evidence did not demonstrate an official policy or practice that deprived plaintiffs of any constitutional rights. The magistrate judge granted summary judgment in favor of the officers in their individual capacities on the basis of qualified immunity. This appeal followed.

II.

Plaintiffs first argue that Officers Fuller, Isenhour and Ivey used excessive force in violation of Terry's Fourth Amendment protection against "unreasonable seizures." See Graham v. Connor, 490 U.S. 386, 394 (1989). At bottom, plaintiffs argue that the escalation of the use of force was unnecessary.**2** We agree with the magistrate judge that the officers were entitled to qualified immunity on the excessive force claim.

The qualified immunity test and the test on the merits of an excessive force claim "both rely on an objective appraisal of the reasonableness of the force employed." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). We must ask "whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." Id. The reasonableness inquiry is guided by at least three factors: (1) the severity of the suspected crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers and others, and (3) whether the suspect actively attempted to evade arrest by flight. Id.; Graham, 490 U.S. at 396. "[T]he immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." Rowland, 41 F.3d at 173.

In this case, the information available to the officers reasonably could have led them to believe that Terry had assaulted his father and perhaps his brother, kidnapped his father at gunpoint, and held his mother hostage at gunpoint in the house. They knew that Terry had epilepsy and could act unpredictably. They reasonably could have believed that allowing Terry to remain in the house posed a danger

_____

**2** Plaintiffs do not challenge the reasonableness of the actual shooting of Terry.

6

to Terry and that leaving the scene altogether would allow Terry to pose a threat to others. In light of these circumstances, a reasonable officer could have believed that the escalation of force was objectively reasonable. See id. Thus, the officers are entitled to qualified immunity on the excessive force claim.

III.

Plaintiffs next argue that Officers Fuller, Isenhour and Ivey violated Terry's Fourth Amendment right to be free from a warrantless arrest in his home absent exigent circumstances. We believe the officers are entitled to qualified immunity on this claim as well.

Qualified immunity shields police officers from civil liability unless their actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Plaintiffs are correct that absent exigent circumstances, the police may not enter a person's home to effect a warrantless arrest. Payton v. New York, 445 U.S. 573, 590 (1980). However, in this case, even assuming the police entered Terry's home to effect a warrantless arrest, see United States v. Maez, 872 F.2d 1444, 1451 (10th Cir. 1989), cert. denied, 489 U.S. 1104 (1991); United States v. Al-Azzawy, 784 F.2d 890, 893 & n.1 (9th Cir. 1985), cert. denied, 476 U.S. 1144 (1986); United States v. Morgan, 743 F.2d 1158, 1166 (6th Cir. 1984), cert. denied, 471 U.S. 1061 (1985); 3 Wayne R. LaFave, Search and Seizure § 6.1(e), at 262 (3d ed. 1996), we cannot say that it was clearly established in July 1993 that the circumstances confronting the officers were not exigent. Factors relevant to the issue of exigency include: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant, (2) the possibility of danger to police guarding the site, (3) the gravity of the offense involved, and (4) whether the suspect is reasonably believed to be armed. See United States v. Reed, 935 F.2d 641, 642 (4th Cir.), cert. denied, 502 U.S. 960 (1991); United States v. Cucci, 892 F. Supp. 775, 786 (W.D. Va. 1995). Here, the police knew Terry was armed with a shotgun. They were aware of his epilepsy and his tendency towards unpredictable, angry outbursts. As previously explained, they knew he had already fired the gun, and they believed he had done so to threaten his father. They also believed that Terry had held his mother hostage. We have found no cases indicating that

7

it was clearly established in July 1993 that these facts would not amount to exigent circumstances.

Plaintiffs insist, however, that United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984), cert. denied, 471 U.S. 1061 (1985), is just such a case. Morgan held that there was no exigency sufficient in that case to justify the officers' warrantless entry into the suspect's home in order to arrest him. However, we believe Morgan is distinguishable. There, the record revealed that there was "no[ ] immediate threat or security risk to the officers . . . ." Id. at 1163. The court continued,

> [T]he evidence shows that the occupants of the[Morgan] house were peaceful until startled by the [police]. Moreover, Morgan's prior contact with police officials had been friendly and cooperative. There was no substantiated evidence that Morgan was dangerous or that a grave offense or crime of violence had occurred or was even threatened.

Id. (internal quotation marks omitted). Because the circumstances in Morgan were sufficiently different from those presented here, we believe Morgan did not render the "unlawfulness . . . [if any, of the officers' actions here] apparent." See Anderson v. Creighton, 483 U.S. 635, 640 (1987). Therefore, we hold that the officers are entitled to qualified immunity on the warrantless arrest claim.

IV.

Finally, we believe summary judgment was properly granted in favor of Gaston County, Ken Beach in his official capacity as Gaston County Chief of Police, and Officers Fuller, Isenhour and Ivey in their official capacities. "[C]laims against[ ] officers in their official capacities are claims against the entities for which the officers were acting." Giancola v. State of West Virginia Dep't of Public Safety, 830 F.2d 547, 550 (4th Cir. 1987); see Kentucky v. Graham, 473 U.S. 159, 165-66(1985). In this case, Chief Beach and Officers Fuller, Isenhour and Ivey were acting on behalf of Gaston County. However, local governments such as Gaston County cannot be liable under § 1983 by virtue of respondeat superior . Monell v. New York City Dep't of Social Serv., 436 U.S. 658, 694 (1978). Rather, local governments are liable under § 1983 only when local government officials

8

themselves, through acts establishing a policy or custom, cause the constitutional violation. <u>Id.</u> In this case, plaintiffs acknowledged that they "cannot show, at this stage of the litigation [i.e., after discovery] how defendants have handled other hostage situations and whether the handling of those situations are pursuant to a policy or whether such acts constitute a custom." Appellants' Brief at 24. Nor did plaintiffs offer evidence of inadequate police training. Therefore, we affirm the grant of summary judgment to Gaston County, Chief Beach in his official capacity, and Officers Fuller, Isenhour and Ivey in their official capacities.

V.

The judgment of the district court is affirmed.

<u>AFFIRMED</u>

9